**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 24-CR-76 (JMC)** |
| | **)** | |
| **RUBIN BORDEAUX,** | **)** | |
| | **)** | |
| **Defendant** | **)** | |
| _____ | **)** | |

### I.    Introduction

Mr. Bordeaux will appear before the Court on April 21, 2025, for a sentencing hearing. He respectfully requests that the Court sentence him to combined sentence of not more than 96 months – one year on Count 3, and 7 years consecutive on Count 2. The Court is required to impose a mandatory minimum sentence of 84 months for the violation of § 924(c), which must run consecutive to any other sentence. The United States Sentencing Guidelines recommend an additional sentence of 108 to 135 months for the violation of § 2119(1). However, that additional period of incarceration is far greater than what is necessary to fully account for all of his conduct and serve the purposes of sentencing, and as discussed below, the Supreme Court has unanimously held that a sentencing court has no obligation to impose a sentence of more than one day on the predicate offense if the sentence on the 924(c) yields a reasonable aggregate sentence. For the reasons set forth below, Mr. Bordeaux respectfully requests that the Court impose a total sentence of no more than 96 months. While the conduct in this case was serious, such a sentence would be sufficient to meet all the goals of sentencing and would be appropriate given the circumstances of this case and Mr. Bordeaux's personal characteristics as outlined below.

## II.    Procedural History

Mr. Bordeaux was arrested on November 14, 2023, in Prince George's County, MD for a series of carjackings. He was immediately detained there and was subsequently charged by criminal complaint with those same carjackings in the District of Columbia on November 16, 2023. He was indicted in D.C. on February 8, 2024, and was transported in custody from Prince George's County to the District on February 16th.  The charges in Prince George's County were dismissed. Thus, he continued to be detained on these same charges from November 14, 2023, to the present. The PSR should be amended after the sentencing hearing to reflect these dates to ensure the BOP properly calculates his release date.

Immediately upon his transfer to the District of Columbia and appointment of counsel, Mr. Bordeaux indicated a desire to plead guilty and negotiations ensued. On September 12, 2024, he entered a guilty plea to Counts 2 and 3 of the indictment charging him with one count of carjacking and using, carrying, possessing or brandishing a firearm during a crime of violence. Pursuant to that plea agreement and to the statutory framework, Mr. Bordeaux faces a mandatory minimum of 7 years on Count 2 which must run consecutive to count 3. But Count 3 has no mandatory minimum period of incarceration, and thus, the Court can vary downward on Count 3 to as little as 1 day. Understanding the seriousness of the offenses to which he has pleaded guilty, Mr. Bordeaux instead asks the Court to vary downward on Count 3 to one year and to impose the mandatory 7 years consecutive on Count 2.

## III.    Objections to the Presentencing Report

Counsel entered her appearance after the final PSR was completed and filed a late notice of objections to the PSR, only two of which need to be addressed. First, the current list of medications Mr. Bordeaux is on should be reflected in the PSR to ensure that he

2

obtains proper medical treatment at the BOP. Counsel submitted those records to the Probation Office. Second, the "Release Status" reflected on the first page of the PSR should note that he has been in custody on these charges since his arrest on November 14, 2023, to ensure that his time is properly calculated by the BOP. Counsel respectfully requests that the Court direct the Probation Office to make these corrections after sentencing and before submitting the PSR to the BOP.

Mr. Bordeaux has no objections to the guidelines calculations but submits that a substantial variance is necessary to meet the purposes of sentencing and to ensure that the sentence is not more harsh than necessary. The grounds for the variance are noted more extensively below, but as it relates to the sentencing guidelines, counsel notes that the 7-level enhancement for discharge of a weapon in particular is excessive given the weapon was discharged toward the ground, not toward any person and Mr. Bordeaux was also convicted of the 924c for brandishing the firearm, thus essentially double counting when the 924c is consecutive. Despite the seriousness of the offense, Mr. Bordeaux did not intend to cause any harm to any individual and while his actions were extremely reckless, no one was physically injured.

## IV.    Application of the Sentencing Factors

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*." *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the

Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The Guidelines are merely one among several sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *Id*. § 3553(a)(1). In

addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351. It is critical for sentencing courts to consider

all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for."). "[R]ecognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]," 18 U.S.C. § 3553(a) (emphasis added). A consideration of the § 3553(a) factors demonstrates that in this case, a sentence of 96 months is sufficient to serve the purposes of sentencing.

### A.  The United States Sentencing Guidelines do Not Require a Sentence of more than 84 months.

When sentencing Mr. Bordeaux, this Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  This Court should not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence

regardless." *Id.* at 351.  Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range.  *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.).  Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. *Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

Section 924(c)(1)(A)(ii) requires that the Court impose a sentence of 84 months on Count Two and that sentence must run consecutive to the sentence imposed on Count Three, the predicate violation of § 2119(1). The Court, however, may consider the "mandatory minimum under § 924(c) when calculating an appropriate sentence for the predicate offense." *Dean v. United States*, 137 S.Ct. 1170, 1177-78 (2017). In *Dean*, the district court and appellate court had ruled that the 924c sentence had to be consecutive to a guideline sentence and that it would be inappropriate to consider the impact of the lengthy consecutive sentence when considering the sentence to impose on the predicate offense. The District Court specifically indicated that if the case were to come back on

remand, the Court would impose a sentence of one day as requested by the defendant on the predicate offense. The Circuit Court said the District Court was correct to believe it had no authority to do so. The Supreme Court unanimously disagreed and reversed, ruling that "[w]hether the sentence for the predicate offense is one day or one decade, a district court does not violate the terms of § 924(c) so long as it imposes the mandatory minimum 'in addition to' the sentence for the violent or drug trafficking crime."). *Id*. Here the Court need not give more than one day on the predicate offense. Since *Dean*, other judges in this Court have sentenced individuals in similar circumstances to sentences far below the guidelines on the predicate offense. *See, e.g.*, *United States v. Tyrell Stewart (22-cr-363-BAH); United States v. Marcel Ennis (18-cr-345-JEB)*. Thus, an aggregate sentence of 96 months would not be an improper sentence in this case.

### B. Mr. Bordeaux's History and Characteristics Warrant a Below Guidelines Sentence

Mr. Bordeaux's life story is one marked by profound adversity. Born into challenging circumstances, he has faced a turbulent childhood shaped by family struggles, environmental hardships, and limited opportunities. His adult life has been further marked by mental health struggles, drug abuse and addiction. These factors highlight the complex circumstances that contributed to his actions, for which he feels profound regret and takes full accountability.

#### 1. Family

Rubin Raphael Bordeaux, now 36, was born in Washington D.C. to a single mother. His half-sister, Precious, was just a year older than him. From an early age, Rubin witnessed his mother's struggle with drug addiction, including heavy use of crack cocaine and marijuana. Some of his earliest memories include being left alone in a room for hours while his mother used drugs. Due to his mother's inability to care for him and his sister,

Rubin and Precious were raised and cared for by a combination of neighbors, his maternal grandmother, who passed away when Rubin was five, and Precious's father, who passed away shortly after his grandmother.

When Rubin was around five years old, his mother believed she had identified his father, who was incarcerated at the time. She reached out to the man's extended family, who became actively involved in Rubin's life for almost three years. While he didn't live with them, Rubin visited frequently, and his extended family was loving and very involved in his young life. He never met the man he had been told was his father because he was incarcerated, but he developed a strong attachment to this extended family. However, a DNA test eventually revealed that the man was not Rubin's father. Upon learning this, the family abruptly cut ties, leaving Rubin feeling abandoned. He quickly went from having a loving, strong family support system to once again having no one. In addition to the sense of abandonment, he also had a profound loss of identity and disappointment at again being unaware of his father's identity.

Throughout Rubin's childhood, he lived in poverty and his mother continued to struggle with drug use and addiction.  They lived in various apartments, once being forced to move after their apartment had been burglarized. Rubin relied on school meals for breakfast and lunch, while dinner was scarce—usually limited to ramen noodles or small portions of whatever was available. They lived in Section 8 housing and had food stamps, but his mother often sold them for drugs. His mother associated with various men, often fellow drug users. When Rubin was eight, he remembers his mother coming home from "hanging out" with one of these men – a family friend who Rubin knew. She was disheveled and her clothing was ripped. She told Rubin that the man had tried to rape her. She didn't

report it to the police, but the incident left young Rubin feeling as though he had failed in his role as the "man of the house."

At age ten, Rubin entered foster care after Precious called child protective services following a volatile argument with their mother. During this time, Rubin discovered he had two younger siblings whom his mother had given up for adoption at birth. Rubin's brother's adoptive family took legal custody of him. Unfortunately, this legal guardian was impulsive and abusive. Rubin recalls being openly taunted, called homophobic slurs, and once being struck in the face with the flat side of a knife.

At 16, Rubin was expelled from his foster home for smoking marijuana and moved back with his mother, staying there until he graduated high school. During this time, he was reunited with his sister Precious and his youngest sister Dominique. Despite enduring a turbulent upbringing and periods of separation during their childhoods, Rubin has successfully maintained relationships with all four of his siblings. His bond with his mother remains intact but is understandably complex —while Rubin loves her, he carries resentment for her ongoing drug abuse and the lifestyle shaped by her addiction. He believes she was a drug addict and user even during her pregnancies with him and his sister. She attempted to shield him from her drug use by putting him in a closed room, but as he aged it was obvious to him that she was doing. To this day, she appears to be in the throes of addiction and also struggles with bipolar disease.

Today, Rubin has four children of his own, ages 9, 9, 4, and 3. While his children live with their mothers, Rubin has maintained regular contact and visitation with each of them despite the many challenges he would face in adulthood. He shares an especially strong bond with Tasha Davis, the mother of his nine-year-old daughter and his best friend. Ms. Davis has submitted a letter to the Court highlighting Rubin's kindness and commitment to

being a good father, not only to their daughter, but to Tasha's oldest son to whom Rubin has been a positive role model.[1]

### 2. Environment

Rubin's difficult upbringing was shaped not only by challenges within his family but also by the environment and influences around him. He has spent his entire life in the Southeast quadrant of Washington D.C., including the years he was in foster care during his childhood. This area is characterized by widespread poverty and a high rate of crime, including frequent gun violence. But it was the only life he knew.

As a child, Rubin found a positive outlet at the local Recreation Center, where he participated in sports and group activities with other kids from the community. He faced a pivotal moment in his life when the center closed around the time Rubin was 11 years old. Without the structure and opportunities the center provided, many of the local youth began engaging in delinquent behavior. While Rubin did not take part in stealing cars himself, he remembers driving around in vehicles stolen by his friends.

By the time Rubin reached his teenage years, the neighborhood had become increasingly unsafe. The house he shared at that time with his mother was in one of the most dangerous parts of the area. Rubin vividly recalls a classmate being fatally shot in the head on the street behind his house, with violent incidents occurring almost daily. The risk was so pervasive that they only ventured outside when absolutely necessary. Rubin was robbed twice, once at gunpoint when he was 16.  He chose not to report the incident to the police, which was standard practice among the neighborhood residents -- aside from potentially being mistreated by police, anyone who reported an incident was labeled as a

---

[1] EXHIBIT 2, pp.1-3

snitch and became a target for further violence.  He remembers this as the point in his life where he began to think about getting a gun to protect himself.

### 3.  Education and Employment

Despite the challenges he faced, Rubin graduated on time from Ballou High School at age 18 in 2006.[2]  As a child, his primary goal was to graduate high school, but he lacked the guidance of role models or mentors to encourage him to dream bigger. While interested in college, he believed it was unattainable due to his socioeconomic background.

As an adult, though he struggled to maintain steady employment, Mr. Bordeaux held many different jobs in various fields including construction, landscaping, and the food service. His dream is to one day own a food truck or possibly even a restaurant. He loves to cook and has been actively pursuing his dream by taking culinary classes on his tablet while being housed at the Central Detention Facility.[3]

In addition to cooking classes, Rubin has been actively working to better himself as a parent and as an individual. He is determined to stay actively involved in his children's lives while he completes his term of incarceration and is proud to have earned his certificate of completion in "Parenting While Incarcerated.[4]"  Mr. Bordeaux very much enjoys learning, and he plans to continue his personal growth and intellectual development by utilizing the programs that will be offered to him though the BOP. He agrees with the programming recommendations of the US Probation Office (PSR ¶135) even though he recognizes he will not get the benefit of a reduction in time for completing the programming

---

[2] EXHIBIT 3, p.9
[3] Ibid, pp. 3-8
[4] Ibid, p.1

because of the nature of his conviction. Indeed he views these programs as opportunities and not punishments.

### 4. Mental and Physical Health

Mr. Bordeaux never received mental health treatment during his childhood -- such resources were not accessible or prioritized in his schools.  He began participating in mental health treatment was he was 19 years old and was diagnosed with bipolar disorder though he believes he likely began struggling with the disorder prior to receiving treatment.  Mr. Bordeaux's mother also has bipolar disorder.[5] Mr. Bordeaux was diagnosed with Major Anxiety Disorder in 2014, and with Depression and Bipolar Disease in 2020 at the Psychiatric Institute of Washington. (PSR ¶89, ¶90). While the PSR merely refers to a prior PSR for this information, Counsel has since obtained the medical records from PIW verifying the information. He continues being treated and medicated for his mental health issues at CDF.[6]

In 2021, Mr. Bordeaux suffered a heart attack resulting in the placement of a stent in his right coronary artery, and a diagnosis of coronary artery disease (PSR ¶80).  His condition requires him to take daily blood thinners, limiting his options for mental health medications.  He is currently prescribed six different medications - a combination of which treat his mental health conditions and also prevent further heart complications.  It is imperative that he continues this regiment when he moves to a federal facility.[7]

---

[5] EXHIBIT 4, p.1;  See also, PSR ¶84, ¶88, ¶91.
[6] Ibid, pp.1-2
[7] Ibid, p.2

### 5.  Substance Abuse and Addiction

Mr. Bordeaux's substance use began at 19 with Ecstasy and escalated over time, culminating in chronic and severe MDMA abuse between 2022 and 2023. His addiction consumed his life, leading to erratic behavior, job loss, and strained relationships. He regrets not seeking help for his addiction and acknowledges that his offense, driven by a need for quick money to sustain his addiction, would likely not have occurred without his dependency.  In the weeks leading up to the offense, Mr. Bordeaux recalls using up to 7 grams of MDMA per day, which is over 50 times greater than the standard dose, and well into what is considered a "lethal dose" (though studies show that even a lethal dose of MDMA is rarely fatal, but instead drives blood pressure to dangerous levels[8]).

The use of MDMA, or "Molly" is most commonly understood to have an impact on the brain's serotonin levels, which can lead to mood swings, anxiety, and depression.  However, further studies suggest that MDMA can lead to actual alterations in the prefrontal cortex activity, impacting a personal's ability to make sound judgments or control their behavior.[9] And more recent studies suggest that chronic and/or prolonged use of MDMA may have broader neurobiological effects than previously believed.[10]

> *The study's findings indicate that chronic MDMA use is associated with increased GLX levels in the striatum (Zimmermann et al., 2023). This increase in glutamate and glutamine concentrations suggests enhanced excitatory activity in this brain region. Such alterations in GLX levels may contribute to the cognitive deficits often observed in MDMA users, such as impaired impulse control and declarative memory (Suarez et al., 2002). The striatum, a key component of the basal ganglia, is involved in motor control, reward processing, and habit formation. The increased GLX levels in the striatum of MDMA users may disrupt the balance in the fronto-striatal pathways associated with impulsive behavior (Gysling et al., 2020).*

---

[8] What Is A Lethal Dose Of MDMA (Ecstasy/Molly)? - Addiction Resource
[9] MDMA Brain Damage: Long-Term Effects on Cognition
[10] New Study Reveals Long-Term Effects of MDMA on the Brain's Glutamate-Glutamine Complex | International Journal of Neuropsychopharmacology | Oxford Academic

Mr. Bordeaux has had candid conversations with counsel regarding his past substance abuse and addiction. He has been able to identify that alcohol plays a key role as the catalyst leading to the use of more serious substances and ultimately resulting in addiction.  He recognizes that sobriety is paramount to ensuring his future success and commitment to a law-abiding life. At the Central Detention Facility, he currently attends Alcoholics Anonymous (AA) meetings every Tuesday, and Narcotics Anonymous (NA) every Thursday. He welcomes the opportunity to take part in drug treatment programs within BOP, and fully intends to continue attending AA meetings after his release and for the rest of his life.

Mr. Bordeaux has further recognized the importance of distancing himself from individuals and environments that encourage substance use. He has no intention of rekindling friendships or associations linked to drug use. After his release, he will rely on the support of his best friend, Tasha, who has always embraced a sober lifestyle. Tasha and Mr. Bordeaux share a child and are committed to being a permanent presence in each other's lives. He also now understands the link between his mental health struggles and his dependency. He knows that it is important that he follow his mental health regime and avoid self-medicating.

In addition to attending support meetings, Mr. Bordeaux has found strength and guidance in his faith. He currently participates in Bible study twice a week and eagerly anticipates sharing this experience with his children by attending church with them after his release.

### C. The Nature and Circumstances of the Offense

Mr. Bordeaux is deeply ashamed, humiliated, and genuinely remorseful for his actions. He fully comprehends the gravity of his crime and accepts complete responsibility. He knows the trauma he caused his victims, having been a victim himself. While recognizing that his behavior is inexcusable, the defense highlights the following mitigating factors that deserve this Court's consideration in determining an appropriate sentence:

*At the time of the offense, Mr. Bordeaux was grappling with unemployment, housing instability, food scarcity, and addiction.*

Mr. Bordeaux was in a state of crisis at the time of the offense. Approximately six months earlier, he began using MDMA ("Molly"), alcohol, and marijuana as a way to cope with the loss of a close personal friend and to self-medicate. His substance use quickly escalated, resulting in a severe addiction. Within this short span of time, he was consuming large amounts of MDMA daily, often staying awake for up to four consecutive days. His addiction completely consumed his life, leading to the loss of his job, his apartment, and his ability to care for his son, whom he had previously been supporting on a bi-weekly basis. During this period, he was frequently moving between temporary living arrangements. A few weeks before the offense, his application for food stamps was denied due to his lack of a stable address. By that point, his sole focus had become finding money for food and to sustain his drug use.

*The offense was not premeditated:*

Mr. Bordeaux and his co-conspirators engaged in minimal, if any, planning before committing the carjackings. At the time, Mr. Bordeaux had been under the influence of drugs for several days and lacked the coherence to devise or execute a structured plan. These were impulsive crimes of opportunity, sparked by the sight of the vehicles. The objective was solely to acquire packages that could be sold for money to purchase food and

drugs. Mr. Bordeaux never had any intention of harming anyone and believed that merely brandishing his gun would suffice to take control of a vehicle. When the driver of the Amazon truck fled, Mr. Bordeaux was caught off guard—he had never anticipated such a reaction and therefore had no plan for how to handle the situation. In a moment of panic, he pursued the driver and fired a shot into the ground.  Mr. Bordeaux understands the gravity of his decision to discharge the weapon, and does not make excuses for this action – he only wishes for the Court to know that his intention was not to injure the driver and that he purposely shot at the ground.

Mr. Bordeaux does not dispute the seriousness of his offenses and has taken responsibility for each of the carjackings he was involved in. However, the government has overstated Mr. Bordeaux's actions in both the second and third incidents. Regarding the second incident, the government states: "… he walked up to the second victim, pointed a gun at him, and demanded that the victim part with the vehicle." [Government SM, p.11]. This assertion is incorrect. Mr. Bordeaux did not point a gun at the victim, a fact supported by the victim's own written statement, where he explicitly noted that Mr. Bordeaux did not point the gun at him, but merely flashed it.[11]

> Q. HOW DID THE SUSPECT(S) ANNOUNCE THE ROBBERY? (WHAT DID THEY SAY TO YOU?)
> A. Was Showing the handgun Soon as the truck open but not Pointing at me and to leave keys in car and get out    [p.72]

> Q. DID THE SUSPECTS THREATEN TO HARM YOU?
> A. Just flashed a hand Gun    [p.73]

Next, the government alleges that Mr. Bordeaux brandished a firearm during the third incident, stating: "CW-3 did not immediately react, so defendant Bordeaux pulled out a

---

[11] [Redacted_PGPD_Det._Ledward_23-0066806_1-2]

black gun and demanded again 'give me the truck.'" This claim is also inaccurate. Mr. Bordeaux did not pull out a gun; instead, he lifted his shirt, exposing his waistband where the gun was visibly tucked. He never physically removed the weapon. This detail is confirmed by the victim in police body camera footage, where the victim stated, "he showed his gun on his side." The victim then mimicked the action himself by lifting his own jacket up slightly to expose his waistband. The victim further stated that he [Mr. Bordeaux] never touched him and clearly just wanted the truck.[12] Finally, the government contends that Mr. Bordeaux's actions became increasingly bold with each event, culminating in a far graver offense. While it is true that his role in the first incident was rather passive, and the final incident was clearly most egregious, there is no evidence to suggest that there was a planned escalation between the incidents. Mr. Bordeaux exhibited essentially the same behavior (flashing a gun) during the second and third incidents; and the fourth incident did not involve a weapon at all (in that instance, Mr. Bordeaux took the keys from the victim's hand, which occurred primarily because the victim, not being a native English speaker, failed to understand his verbal instructions to hand over the keys). Again, none of this is intended to suggest that the offenses were not serious and traumatic for the victims.

### D. Criminal History

Mr. Bordeaux does have some criminal history, but it is not violent and is largely drug related. And perhaps most importantly, has never involved a lengthy period of incarceration and he has always successfully completed his periods of supervision. At 18 years old, he received probation before judgement for a minor offense and successfully completed his term of probation. PSR ¶43. At age 22, he received a suspended sentence for possession of a firearm, with one year of probation and successfully completed that

---

[12] Video: [Amtrak Victim Statement]

supervision. PSR ¶ 44. At 27, he received a suspended sentence for a drug offense with a term of 18 months or probation which he successfully completed. PSR ¶45. At age 31, he received his only prior sentence of incarceration – 20 months for possession of a firearm, with 12 months of supervised release. He had no infractions in the BOP and successfully completed his term of supervision with no revocations. Acknowledging that this offense if far more serious than his prior offenses, it is also important to recognize that the escalation of punishment for these offenses is dramatic even considering the sentence requested by the defense.

## IV.  The Purposes of Sentencing and the Kinds of Sentences Available

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). Given Mr. Bordeaux's history and characteristics, he is facing a lengthy prison sentence. However, a sentence of more than 8 years is not necessary for individual deterrence, to protect the public or for rehabilitation.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How*

*Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").

In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety." *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016). This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences." Austin, Brennan Ctr., *supra*, at 35. Some studies have concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher recidivism. *Id*. Similarly, a 2002 Justice Department study "found that recidivism rates did not differ significantly among those released after serving 6 months or less compared to those serving sentences all the way up to 30 months in prison." *Id*. at 36.

With respect to general deterrence, studies also "indicate that long prison sentences have little or no impact on reducing the criminal behavior of the public at large" because "most people consider immediate circumstances and emotions instead of longer term legal consequences when acting or reacting." *Id*. Significantly, a 1997 study in Richmond, Virginia "found no deterrent effect associated" with a policy "that increased prison sentences for gun crimes by prosecuting them as federal crimes." *Id*. at 37.

Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Community-based sanctions provide better opportunities for rehabilitation, and the Court can further serve the

purposes of sentencing by imposing restrictive conditions of supervised release. *See Gall*, 552 U.S. at 48 (supervised release is a "substantial restriction of freedom").

Given Mr. Bordeaux's history, a sentence of 168 months followed by a lengthy term of supervised release would sufficiently punish Mr. Bordeaux and serve all of the purposes of sentencing.

### V.        The Need to Avoid Unwarranted Sentencing Disparities

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004). The following cases contain examples of such similarities and differences which may be taken into consideration when deciding Mr. Bordeaux's sentence.

• *United States v. Lonnell Hart (18-cr-237-TSC):* Hart pleaded guilty to four Counts of 2B3.1 – brandishing a firearm, after he and his co-defendants committed a string of armed robberies of multiple CVS pharmacies. Hart had a base level offense of 29 and a Criminal History category of V (which included previous armed robberies as well as other violent offenses).[13] The Honorable Judge Chutkan sentenced Hart to 132 months incarceration, notwithstanding the government recommendation of 180 months.

---

[13] Government Sentencing Memorandum, ECF 198

• *United States v. Tyrell Stewart (22-cr-363-BAH):* Stewart and his co-defendants stole a truck in Maryland and then drove to DC where they robbed a 7-11, brandishing a gun at the cashier and also holding a customer at gunpoint to obtain his car keys before stealing the second vehicle. During the incident, a co-defendant had discharged his weapon while inside the 7-11. Shortly after, they robbed a Mini Mart where Steward discharged his weapon to intimidate the cashier to complying with his demands. Finally, the group violently robbed a pedestrian of his wallet on the same day. The government pointed to the store robberies as a well-organized and premeditated plan carried out by Stewart and his co-defendants, all members of the affiliated Kennedy Street Crew ("KDY").[14] The agreed upon sentencing guidelines was 14-16 years, with a government recommendation of 16 years. The Honorable Judge Howell sentenced Stewart to 10 years incarceration.

• *United States v. Marcel Ennis (18-cr-345-JEB*): Ennis pleaded guilty to one Count of armed carjacking and one Count of brandishing a firearm during a crime of violence. According to the government, Ennis committed a carjacking and later fled from police in the stolen vehicle, leading them on a chase though the city. Ennis crashed the vehicle and then continued his flight by jumping in the back of a victim's truck and ordering them to drive at gunpoint. After driving a short distance, the victims managed to jump out of the vehicle which was then overtaken by Ennis who continued to drive the truck, fleeing from police, and hitting a pedestrian before finally crashing into a police car and continuing to flee on foot. The total offense level was 25, and Criminal History Category was V which included a history of carjackings. The guideline range was calculated at 184-209 months with a statutory mandatory minimum of 84 months.[15]

---

[14] Government Sentencing Memorandum, ECF 46
[15] Government Sentencing Memorandum, ECF 22

Like Mr. Bordeaux, Ennis grew up in an unstable environment and had a history of substance abuse. The Honorable Judge Boasberg imposed the minimum sentence of 84 months notwithstanding the government recommendation of 184 months.

### VI.     Conclusion

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Bordeaux respectfully requests that the Court impose a total term of incarceration of no more than 96 months—the mandatory minimum term of 84 months on Count Two, with a consecutive term of twelve months on Count Three. Such a sentence would be substantial. Given his history and circumstances, his role in the offenses, and his early acceptance of responsibility, such a sentence would be sufficient to serve the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____
Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Avenue NW
Suite 550
Washington, D.C. 20004
(202) 208-7500
Shelli_Peterson@fd.org